UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| JODI ORCUTT, ET AL | : CASE NO:  3:07 1306 VLB |
| V. | : |
| SPICERS NOANK INNER MARINA LLC | :  JANUARY 21, 2009 |

**PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION IN LIMINE TO
PRECLUDE EXPERT WITNESS**

      This is a personal injury action wherein the plaintiff, Jodi Orcutt, alleges that she fell at the end of a ramp while exiting the defendant's retail store.  The end of the ramp has a vertical drop-off of approximately two inches where the ramp meets the asphalt parking lot.  The plaintiff testified that as she placed her right foot down at the bottom of the ramp, her foot caught the edge of the ramp causing her ankle to twist and further causing her to fall to the ground on her outstretched left hand resulting in her suffering multiple injuries including a dislocated and broken left elbow.

      On May 30, 2008, the plaintiff disclosed David C. Cowen, A.I.A., as a liability expert.  In his report dated April 9, 2008 (attached as Exhibit 1), Mr. Cowen opined that the cause of the plaintiff's loss of balance and resulting fall were the unsafe and hazardous ramp conditions including:

      1)     an excessively steep ramp;

      2)     an inconspicuous drop-off at the end of the ramp;

      3)     the absence of an effective handrail; and

      4)     a defective walking surface at the ramp's bottom landing.

At the time Mr. Cowen rendered his initial report it was unknown by plaintiff's counsel and Mr. Cowen as to the year that the retail store and ramp had been constructed. Accordingly, Mr. Cowen, in rendering his report and opinions relied upon the 1996 edition of the National Building Code which had been adopted by Connecticut and which was in effect on the date of the plaintiff's fall. Mr. Cowen's report expressly stated that his findings were "subject to change if additional information becomes available."

On October 17, 2008, a representative of the defendant was deposed and this person testified that the subject building and ramp were constructed in 1977 or 1978 and that there were no modifications, maintenance or structural repairs done to the concrete ramp other than changing the astro-turf covering positioned on top of the ramp. Prior thereto, the defendant complied with the plaintiff's interrogatories wherein the defendant also indicated that the subject building and ramp were constructed in 1977 or 1978.

By court order dated October 30, 2008, this case was assigned to Magistrate Judge Thomas P. Smith for a settlement conference. The parties attended the settlement conference on January 5, 2009. The case did not resolve and thereafter plaintiff's counsel immediately forwarded a copy of the defendant representative's deposition transcript to Mr. Cowen, the plaintiff's liability expert.

In light of the subject building and ramp having been constructed in 1977 or 1978, Mr. Cowen issued an amended/revised report dated January 12, 2009 (attached as Exhibit 2), wherein he modified his findings based upon his use of the 1970 edition of the National Building Code which had been adopted by Connecticut and which was effective on the date the building and ramp were constructed. Mr. Cowen's opinions concerning the cause of the plaintiff's fall did <u>NOT</u> change. The substantive change was his reliance

upon the 1970 edition of the National Building Code (which was in effect when the building and ramp were constructed) rather than the 1996 edition of the National Building Code (which was in effect on the date of the plaintiff's fall).

Under Rule 26(a)(2) of the Federal Rules of Civil Procedure, parties are required to disclose the identity of any expert witness and provide a written report prepared by the witness "at the times and in the sequence directed by the court."

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that:

> A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial . . . any witness or information not so disclosed.

By consent Order, the parties agreed that the plaintiff had until May 31, 2008 to disclose expert witnesses and that the parties were to complete all discovery by August 31, 2008. In this case, Mr. Cowen was disclosed as an expert witness on May 30, 2008. Thereafter the parties continued with discovery and on January 12, 2009, Mr. Cowen issued an amended/revised report based upon information learned through discovery.

The Second Circuit has discussed several factors that should be considered by courts when addressing preclusion of expert testimony. These factors include: "the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; the possibility of a continuance; the party's explanation for the failure to comply with the discovery order; and the importance of the precluded witness". Wolak v. Spucci, 217 F.3rd 157, 161 (2d Cir. 2000) quoting Softel, Inc. v Dragon Med and Scientific Communications, Inc., 118 F.3rd 955, 961 (2d Cir. 1997).

Regarding Mr. Cowen's amended/revised report, the defendant is not substantially prejudiced. The defendant, through Mr. Cowen's initial report, was expressly put on notice that his findings and opinions might change based upon additional information becoming available.

In this instance, Mr. Cowen's opinions and conclusions have <u>not</u> changed. Rather the substantive change was simply Mr. Cowen's reliance upon an earlier edition of the National Building Code. To permit Mr. Cowen to testify concerning his reliance upon the 1970 edition of the National Building Code does not substantially prejudice the defendant. This is not a situation where an expert witness is being disclosed on the eve of trial as Mr. Cowen was timely disclosed. His findings are simply being modified based upon information learned through discovery. Furthermore, Mr. Cowen was never deposed by the defendant and therefore this is not a situation where a party has incurred expenses in deposing an expert, only to have the expert subsequently change his opinion resulting in the party being compelled to incur additional expenses in re-deposing the expert witness.

If the defendant claims prejudice the appropriate avenue would be to continue this matter to allow defendant an opportunity to depose Mr. Cowen and disclose its own expert if it desires. Under Connecticut law, a continuance of the trial and not the preclusion of evidence or expert testimony is the preferred method for dealing with a late disclosure. <u>Levesque Builders, v. Hoerle</u>, 49 Conn.App. 751 (1998).

Courts have held that preclusion under rule 37 is a "drastic remedy" that should only be applied "in those rare cases where a party's conduct represents flagrant bad faith and callous disregard of the Federal Rules of Civil Procedure". <u>Grdinich v. Bradlees</u> 87

F.R.D. 77, 79 (S.D.N.Y. 1999). Rule 37(c)(1) preclusion does not apply where the offending party's failure to disclose was "substantially justified". Id. Even if the failure to disclose was not substantially justified, the exclusion does not apply if the failure was harmless. Id.

In this case the plaintiff timely disclosed Mr. Cowen as an expert witness on May 30, 2008. Discovery continued after the expert disclosure. On June 8, 2008, the defendant complied with the plaintiff's interrogatories through which the plaintiff learned that the building and subject ramp were constructed in 1977 or 1978. On July 8, 2008, plaintiff's counsel forwarded a copy of the interrogatory compliance to Mr. Cowen (See Affidavit of S. Bertucio attached as Exhibit 3). Thereafter, the plaintiff noticed the deposition of a representative of the defendant entity. The deposition was ultimately done on October 17, 2008. It was plaintiff counsel's intent to have Mr. Cowen review the defendant representative's deposition transcript and then update and modify his findings/opinions, if such was necessary. Id. Plaintiff's counsel received the deposition transcript on or about November 6, 2008.

In the interim, on October 30, 2008, this case was referred to Magistrate Judge Thomas P. Smith for a settlement conference. At that point the undersigned counsel was optimistic that this case would settle. Counsel was also aware that increasing litigation expenses could be detrimental to the possibility of settlement from the plaintiff's perspective. (See Affidavit attached as Exhibit 3). Accordingly, the undersigned opted to refrain from forwarding the deposition transcript to Mr. Cowen until after the settlement conference. (See Affidavit attached as Exhibit 3). Ultimately, the settlement conference was held on January 5, 2009 and this case was not resolved. When

settlement did not occur, plaintiff's counsel immediately forwarded the deposition transcript to Mr. Cowen with instructions to advise of any changes in his findings or opinions based upon the information that the building and ramp were constructed in 1977 or 1978. On January 12, 2009, Mr. Cowen issued his amended/revised report and the report was disclosed to defense counsel the following day.

Under these circumstances, the plaintiff's delay in having Mr. Cowen review additional information and update his report does not represent the "flagrant bad faith" or "callous disregard" required for preclusion.

This instance is similar to Grdinich v. Bradlees, 187 F.R.D. 77, 79 (S.D.N.Y. 1999). In Grdinich, the parties were involved in court-sponsored mediation and the plaintiff disclosed an expert witness after the expert disclosure date set by the Scheduling Order. The court held that in light of the ongoing settlement negotiations the plaintiff acted "justifiably and cost-effectively" in temporarily suspending expert "preparation" and therefore the late disclosure did not constitute "flagrant bad faith" or "callous disregard" required for preclusion. Rather, the court concluded that any prejudice or harm to the defendant could be remedied by permitting the defendant additional time to depose the expert and disclose its own expert witness. Id. Also see Hinton v. Patnaude, 162 F.R.D. 435, 439 (N.D.N.Y. 1995) (plaintiff justified in suspending medical expert discovery during settlement negotiations and pending defendant's summary judgment motion).

The defendant argues that Mr. Cowen's opinions are based upon code standards effective after the date the building and ramp were constructed. The plaintiff concedes that Mr. Cowen's initial report dated April 9, 2008, is based upon code standards after the

date the building and ramp were constructed.  However, upon learning of the date of the construction, Mr. Cowen issued the amended/revised report dated January 12, 2009, wherein he expressly relies upon the 1970 edition of the National Building Code.  In light of Mr. Cowen's supplemental report, the defendant's contention that Mr. Cowen's earlier reliance on subsequent code standards more appropriately goes to the weight of Mr. Cowen's testimony and not to its admissibility.

In its motion to preclude, the defendant further argues that Mr. Cowen's opinion as to causation should be precluded as it is based upon insufficient information as Mr. Cowen "gives no detail about what or how Mrs. Orcutt fell, what she was wearing, what she had been doing, which medications she was taking and hadn't taken that day, and the mechanics of how she fell, etc." and that Mr. Cowen failed to consider alternative explanations (ie. allegedly untied boots) as the cause of the plaintiff's fall.

Defendant's position is misplaced.  Mr. Cowen's report expressly states that the plaintiff was wearing work boots and that as the plaintiff stepped on the bottom end of the ramp, the plaintiff's right heel landed across an abrupt and inconspicuous drop-off causing her to twist her ankle, lose her balance and fall.  Arguments defendant may raise concerning what medications the plaintiff may or may not have taken that day and what effect, if any, the plaintiff's allegedly untied boots may have played in her fall go to the weight of Mr. Cowen's testimony not its admissibility.

For the foregoing reasons, the defendant's motion to preclude David C. Cowen, A.I.A., from offering expert opinion testimony should be denied.  In denying the defendant's motion, the plaintiff would have no objection to a continuance of the trial

date to allow the defendant an opportunity to depose Mr. Cowen and/or disclose its own

witness.

PLAINTIFF,

BY        /s/  ct#11906
           Stephen P. Bertucio
           Federal Bar No. ct11906
           SALOMONE & MORELLI
           100 Farmington Avenue
           Hartford, CT  06105
           (860)548-9991

## CERTIFICATION

I hereby certify that on January 21, 2009, a copy of the foregoing objection was

filed electronically and served by mail on anyone unable to accept electronic filing.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's

electronic filing system or by mail to anyone unable to accept electronic filing.  Parties

may access this filing through the Court's CM/ECF system.

       /s/   ct#11906
       Stephen P. Bertucio

# EXHIBIT 1

## David Cowen report dated April 9, 2008

# ARCHITECT'S REPORT

## on the

# ORCUTT INJURY

By:

David C. Cowen, A.I.A.

April 9, 2008

07NE0053

## Robson Forensic
### Engineers, Architects, Scientists & Fire Investigators

01/21/2009 16:07 FAX 860 549 0679 BY LBD SALOMONE AND MORELLI Ø004
Case 3:07-cv-00630-LBD Document 63-2 Filed 02/20/20 Page 27 of 8

# ORCUTT INJURY

April 9, 2008

## A. INTRODUCTION

On October 2, 2005, at about 11 am, Jodi Orcutt exited the front door of the
Spicer's Marina Ship's Store located at 93 Marsh Road in Noank (Groton),
Connecticut. Orcutt descended the ramp immediately outside the door. When
she stepped onto the bottom of the ramp, a drop-off at the edge of the ramp
caused her to lose her balance. She was unable to recover her balance, fell, and
was injured.

This investigation was performed to determine if conditions of the premises were
dangerous in a manner that caused Orcutt's fall and injury.

## B. AVAILABLE INFORMATION

   1. (6) Color Photographs, taken May 23, 2006 or before.
   2. My Site Inspection of June 13, 2007.

## C. DESCRIPTION OF THE INCIDENT

Orcutt had gone to the marina store to pick up a key to a ladies room. She was
wearing work boots. She was wearing her contact lenses. The weather was
clear and pavements were dry.

After obtaining the washroom key, Orcutt exited the store through the doors at
the front of the building. She descended a pedestrian ramp in front of the doors
carrying only the key, heading toward the right front corner of the ramp[1].

As she stepped onto the bottom end of the ramp, her right heel landed across an
abrupt and inconspicuous drop-off at the end of the slope, causing her to twist
her ankle and lose her balance.

She was unable to recover her balance, fell, and was injured, breaking her arms
when she fell onto the pavement.

---

[1] All right hand / left hand indications for building are as one is descending the ramp.

## D. SITE CONDITIONS

The Ship's Store at the Spicer's Marina has a ramp at the front doors that is the only apparent means for customers to enter and exit. The front doors are a pair of aluminum framed full height glass out-swinging doors. The left door leaf contains the lock cylinder making it the active leaf.

The ramp is approximately 10 feet 1 inch long and 8 feet 6 inches wide. The slope of the ramp begins immediately outside the threshold of the doors without a level top landing. The ramp is bounded by a wall of the building on the left side. The right side of the ramp is open to the grade below.

There is a horizontal wood board about 2 feet 10 inches above the ramp along the right edge. The wood board 5 3/8 inches wide and 1 3/8 inches thick and is oriented laid flat. The board is attached to face of the building at the top of the ramp and slopes down along the ramp, stopping about 2 inches back from the bottom of the ramp. The board is attached to two vertical steel tube posts at the middle and near the bottom end. The board finish is deteriorated with peeling paint and splintering wood on its surface.

The slope of the ramp varies from about 13% to more than 18%. The ramp is covered with an Astro-turf style floor covering. This covering is over a hard subsurface (probably cast in place concrete, judging by the feel of the surface and what is visible along the open side). At the bottom of the ramp, the edge drops off vertically, varying from 1 to 2 inches along the edge. The Astro-turf wraps around the drop off covering the vertical edge.

The bottom landing of the ramp is the blacktop pavement of the parking lot in front of the store.

## E. CAUSES OF THE INCIDENT

Orcutt's loss of balance and resulting fall and injury were caused by unsafe and hazardous ramp conditions that included an excessively steep ramp, an inconspicuous drop-off at the end of the ramp, the absence of an effective handrail, and a defective walking surface at the ramp's bottom landing.

## F. ANALYSIS

General

The effective Connecticut State Building Code at the time of the injury was the 1996 edition of the BOCA National Building Code (BOCA 96). The Connecticut

State Building Code requires "the arrangement of building elements required to provide a reasonably safe means of egress." (1001.1)

ASTM F1637-95 Standard Practice for Safe Walking Surfaces, a national standard for construction and minimum maintenance criteria requires that:

4.2 Walkway Changes in Level:
4.2.1 Adjoining walkway surfaces shall be made flush and fair, whenever possible and for new construction and existing facilities to the extent practicable.
4.2.2 Changes in levels of less than 1/4 in. in height may be without edge treatment. (See Fig. 1.)
4.2.3 Changes in levels between 1/4 and 1/2 in. shall be beveled with a slope no greater than 1:2 (rise:run).
4.2.4 Changes in levels greater than 1/2 in. (12 mm) shall be transitioned by means of a ramp or stairway that complies with applicable building codes, regulations, standards, or ordinances, or all of these.

and

4.7 Exterior Walkways:
4.7.1 Exterior walkways shall be maintained so as to provide safe walking conditions.
4.7.2 Exterior walkways shall be repaired or replaced where there is an abrupt variation in elevation between surfaces. Vertical displacements in exterior walkways shall be transitioned in accordance with 4.2.

Slope

The average slope of the subject ramp is about 16%. The Connecticut State Building Code prohibits a ramp slope greater than 1:12 ratio, which is 8.33% (Section 1016.0) for this height of transition, and has prohibited greater slopes for pedestrian ramps for more than 20 years (BOCA 84). The subject ramp slopes at an angle that is about twice as steep as the maximum slope permitted. A sloping walking surface propels the descending pedestrian forward, increasing in effect and difficulty of descent as the slope is increases. The excessively steep slope of the ramp would have caused Orcutt to descend more quickly and/or requiring greater difficulty, increasing the likelihood of a misstep.

Ramp End Drop Off

Ramps, even if only half the steepness of this one, are required by the Building Code to have level landings at the bottom to permit users to safely end the ramp descent. Landings should transition from the ramp to landing without a drop-off (ANSI A117.1, ASTM F1637). At the bottom edge where Orcutt was stepping

from the Astro-turf ramp to the blacktop, at the right corner of the ramp, there is a depression in the blacktop. The ramp ends and drops off vertically about 2 inches down to the blacktop. The blacktop then slopes up the reverse angle of the ramp until reaching the approximate projected level of the ramp about 18 inches from the bottom edge.

The Building Code requires that ramp landings have a maximum slope of 1:48, or about 2%, which is essentially flat with just enough pitch to drain standing water.

The depression at the start of the landing did not meet standards for safe pedestrian ramps and created an unexpected hole, causing Orcutt to catch her left foot as she was trying to recover from her initial loss of balance.

Inconspicuous Drop Off

Pedestrian falls are frequently the result of low elements in the path because they are outside the natural range of vision and are not reliably seen[2]. Ramps should transition smoothly from the ramp to the landing without drop-offs. The presence of a 2 inch drop-off at the end of the ramp is unusual and unexpected, and constitutes an unacceptable short step from the end of the ramp to the ramp's landing.

The Astro-turf covering is akin to a grass lawn with 'blades of grass' projecting from the surface. With the change of material from the Astro-turf to the blacktop at the bottom edge of the ramp, the presence of a drop off was not conspicuous, and the short height of the drop off also makes it difficult to properly identify.

Single steps have been known to be hazardous for more than 25 years, even when open to view, due to their inconspicuous nature, and the State building code forbids stairs less than 4 inches in height.[3] ASTM F1637-93 requires that "short flight stairs shall be avoided where possible." (6.2.1)

The drop off at the bottom of the ramp was unusual, not reasonably conspicuous, and violated applicable standards for safe walkways, and was a cause of the Orcutt fall.

Handrails

Handrails are necessary safety equipment on ramps of this type. Handrails provide a grab bar to assist in ascent and descent, and to regain one's balance in the event of a misstep.

---

[2] Safety and Health for Engineers, Roger L. Brauer, 1990.
[3] Guidelines for Stair Safety, a 1979 nationally published study by the National Bureau of Standards and the CPSC identified that one riser steps are inconspicuous and dangerous (Section 2.5.6).

Exterior exit ramps have been required by the Connecticut State Building Code to have handrails along both sides for more than 20 years. Ends of the handrail were required as follows:

> 1022.2.3 Handrail ends: [At] the top and bottom of a ramp, the handrails shall extend at least 12 inches beyond the top and bottom of the ramp segment and shall be parallel with the floor or ground surface. (BOCA 96)

The board along the right side of the ramp is not an acceptable nor effective handrail. The Building Code prohibits a perimeter dimension of handrail exceeding 6 ¼ inches to provide a graspable bar. The wood board has a total perimeter of 13 ½ inches, more than twice the maximum permitted by the Building Code, and cannot be effectively grasped by an average hand. The board stopped more than a foot short of the extent required by the Building Code, stopping it short of where Orcutt stepped from the bottom of the ramp. The board's poorly maintained condition further discouraged use due to the rough and splintered condition of the wood.

The absence of a functional handrail denied Orcutt a grab bar to assist in her descent down the excessively steep ramp, and denied her a grab bar that might have aided recovery from her loss of balance as she stepped at the end of the ramp.

## G. FINDINGS

Within the bounds of reasonable technical certainty, and subject to change if additional information becomes available, it is my professional opinion that:

1. The conditions of the ramp where Jodi Orcutt fell were hazardous and a substantial cause of her fall and resulting injury.

2. The characteristics of the ramp and landing that caused the fall did not comply with the Connecticut State Building Code and other widely accepted building safety standards with regards to excessive steepness, absence of effective handrail, irregular and unexpected drop-off at the end, and the irregular landing.

3. Those responsible to maintain the building should have known of the unsafe conditions and repaired the unsafe elements to provide a safe means of egress from the building that conformed with reasonable standards.

4. It was foreseeable that the conditions of this ramp would increase the likelihood of a fall and injury by members of the public.

David C. Cowen, A.I.A.

# EXHIBIT  2

## David Cowen report dated January 12, 2009

**ARCHITECT'S REPORT**

on the

**ORCUTT INJURY**

By:

David C. Cowen, A.I.A.

January 12, 2009

07NE0060

# Robson Forensic

Engineers, Architects, Scientists & Fire Investigators

**ORCUTT INJURY**

**ARCHITECT'S REPORT**                                      **January 12, 2009**

## A. INTRODUCTION

On October 2, 2005, at about 11 am, Jodi Orcutt exited the front door of the Spicer's Marina Ship's Store located at 93 Marsh Road in Noank (Groton), Connecticut.  Orcutt descended the ramp immediately outside the door.  When she stepped onto the bottom of the ramp, a drop-off at the edge of the ramp caused her to lose her balance.  She was unable to recover her balance, fell, and was injured.

This investigation was performed to determine if conditions of the premises were dangerous in a manner that caused Orcutt's fall and injury.

## B. AVAILABLE INFORMATION

1. (6) Color Photographs, taken May 23, 2006 or before.
2. Deposition of William Spicer III, 10/17/08.
3. My Site Inspection of June 13, 2007.

## C. DESCRIPTION OF THE INCIDENT

Orcutt had gone to the marina store to pick up a key to a ladies room.  She was wearing work boots.  She was wearing her contact lenses.  The weather was clear and pavements were dry.

After obtaining the washroom key, Orcutt exited the store through the doors at the front of the building.  She descended a pedestrian ramp in front of the doors carrying only the key, heading toward the right front corner of the ramp[1].

As she stepped onto the bottom end of the ramp, her right heel landed across an abrupt and inconspicuous drop-off at the end of the slope, causing her to twist her ankle and lose her balance.

She was unable to recover her balance, fell, and was injured, breaking her arms when she fell onto the pavement.

## D. SITE CONDITIONS

According to the William Spicer, the Ship's Store at the Spicer's Marina was constructed in 1977 or 1978.  The ramp where Orcutt fell is at the front doors of

---

[1] All right hand / left hand indications for building are as one is descending the ramp.

the store and is the only apparent means for customers to enter and exit and is a means of egress from the store.

The front doors are a pair of aluminum framed full height glass out-swinging doors. The left door leaf contains the lock cylinder making it the active leaf.

The ramp is approximately 10 feet 1 inch long and 8 feet 6 inches wide. The slope of the ramp begins immediately outside the threshold of the doors without a level top landing. The ramp is bounded by a wall of the building on the left side. The right side of the ramp is open to the grade below.

There is a horizontal wood board about 2 feet 10 inches above the ramp along the right edge. The wood board 5 3/8 inches wide and 1 3/8 inches thick and is oriented laid flat. The board is attached to face of the building at the top of the ramp and slopes down along the ramp, stopping about 2 inches back from the bottom of the ramp. The board is attached to two vertical steel tube posts at the middle and near the bottom end. The board finish is deteriorated with peeling paint and splintering wood on its surface.

The slope of the ramp varies from about 13% to more than 18%. The ramp is covered with an Astro-turf style floor covering. This covering is over a hard subsurface (probably cast in place concrete, judging by the feel of the surface and what is visible along the open side). At the bottom of the ramp, the edge drops off vertically, varying from 1 to 2 inches along the edge. The Astro-turf wraps around the drop off covering the vertical edge.

The bottom landing of the ramp is the blacktop pavement of the parking lot in front of the store.

## E. CAUSES OF THE INCIDENT

Orcutt's loss of balance and resulting fall and injury were caused by unsafe and hazardous ramp conditions that included an excessively steep ramp, an inconspicuous drop-off at the end of the ramp, the absence of an effective handrail, and a defective walking surface at the ramp's bottom landing.

## F. ANALYSIS

General

The effective Connecticut State Building Code at the time of the injury was the 1996 edition of the BOCA National Building Code (BOCA 96). The Connecticut State Building Code requires "the arrangement of building elements required to provide a reasonably safe means of egress." (1001.1)

The American Society for Testing and Materials (ASTM) develops and nationally publishes professional consensus standards.  ASTM F1637-95 "Standard Practice for Safe Walking Surfaces" is a national standard for minimum criteria of new and existing walkways.  The standard requires that:

> 4.2 Walkway Changes in Level:
> 4.2.1 Adjoining walkway surfaces shall be made flush and fair, whenever possible and for new construction and existing facilities to the extent practicable.
> 4.2.2 Changes in levels of less than 1/4 in. in height may be without edge treatment. (See Fig. 1.)
> 4.2.3 Changes in levels between 1/4 and 1/2 in. shall be beveled with a slope no greater than 1:2 (rise:run).
> 4.2.4 Changes in levels greater than 1/2 in. (12 mm) shall be transitioned by means of a ramp or stairway that complies with applicable building codes, regulations, standards, or ordinances,  or all of these.

and

> 4.7 Exterior Walkways:
> 4.7.1 Exterior walkways shall be maintained so as to provide safe walking conditions.
> 4.7.2 Exterior walkways shall be repaired or replaced where there is an abrupt variation in elevation between surfaces. Vertical displacements in exterior walkways shall be transitioned in accordance with 4.2.

Slope

The average slope of the subject ramp is about 16%.  The current Connecticut State Building Code prohibits a ramp slope greater than 1:12 ratio, which is 8.33% (Section 1016.0) for this height of transition, and has prohibited greater slopes for pedestrian ramps for more than 30 years (BOCA 75).  The adopted Connecticut Building Code at the time of the original construction of the Ship Store building was the 1970 edition of the BOCA code.

The BOCA 1970 required:

> Section 1617.0 Exitway Ramps
> Ramps with a gradient of not more than one (1) in ten [10%] may be used as an exitway component and shall comply with all the applicable requirements of required interior stairways as to enclosure, capacity, and limiting dimensions.

The subject ramp slopes at an angle that is about twice as steep as the maximum slope that has been permitted for thirty years, and about 60% steeper

than was permitted by the adopted State code when the building was first constructed. A sloping walking surface propels the descending pedestrian forward, increasing in effect and difficulty of descent as the slope is increases. The excessively steep slope of the ramp would have caused Orcutt to descend more quickly and/or requiring greater difficulty, increasing the likelihood of a misstep.

Ramp End Drop Off

Ramps, even if only half the steepness of this one, are required by the Building Code to have level landings at the bottom to permit users to safely end the ramp descent. Landings should transition from the ramp to landing without a drop-off (ANSI A117.1, ASTM F1637). At the bottom edge where Orcutt was stepping from the Astro-turf ramp to the blacktop, at the right corner of the ramp, there is a depression in the blacktop. The ramp ends and drops off vertically about 2 inches down to the blacktop. The blacktop then slopes up the reverse angle of the ramp until reaching the approximate projected level of the ramp about 18 inches from the bottom edge.

The depression at the start of the landing did not meet standards for safe pedestrian ramps and created an unexpected hole, causing Orcutt to twist her right foot causing a loss of balance. The depression of the blacktop at the bottom of the ramp was not in any likelihood the condition of the original construction and is consistent with the results of progressive uneven settlement of a pavement.

Inconspicuous Drop Off

Pedestrian falls are frequently the result of low elements in the path because they are outside the natural range of vision and are not reliably seen[2]. Ramps should transition smoothly from the ramp to the landing without drop-offs. The presence of a 2 inch drop-off at the end of the ramp is unusual and unexpected, and constitutes an unacceptable short step from the end of the ramp to the ramp's landing.

The Astro-turf covering is akin to a grass lawn with 'blades of grass' projecting from the surface. With the change of material from the Astro-turf to the blacktop at the bottom edge of the ramp, the presence of a drop off was not conspicuous, and the short height of the drop off also makes it difficult to properly identify.

Single steps have been known to be hazardous for more than 25 years, even when open to view, due to their inconspicuous nature, and the current State

---

[2] Safety and Health for Engineers, Roger L. Brauer, 1990.

Page 4 of 6

building code forbids stairs less than 4 inches in height.[3] ASTM F1637-95 requires that "short flight stairs shall be avoided where possible." (6.2.1)

The drop off at the bottom of the ramp was unusual, not reasonably conspicuous, and violated applicable standards for safe walkways, and was a cause of the Orcutt fall.

Handrails

Handrails are necessary safety equipment on ramps of this type. Handrails provide a grab bar to assist in ascent and descent, and to regain one's balance in the event of a misstep.

Exterior exit ramps serving as means of egress have been required by the Connecticut State Building Code to have handrails since the time this building and ramp were originally constructed. The BOCA 1970, the adopted Connecticut State Building Code at the time of the construction, required:

> Section 1621.0 Exterior Exitway Stairways
> 1621.5 Construction: Exterior stairs shall be constructed entirely of steel or other approved non-combustible materials with pipe handrails on both sides of stairways and platforms.

Before the subject building was originally constructed, the BOCA 1975 national building code required:

> Section 1615,0 Exitway Ramps
> 615.2 Handrails: Handrails shall be provided on at least one side of every ramp, and they shall be not less than thirty inches nor more than 33 inches in height, measured from the surface of the ramp. Handrails shall be smooth and shall extend one foot beyond the top and bottom of the ramp and return to walls or posts at the ends.

The board along the right side of the ramp is not an acceptable nor effective handrail. "Architectural Graphic Standards" 6th Edition (1971), a widely referenced design publication, provides numerous handrail profiles all sharing the feature of a handrail of a shape which can be wrapped by a typical hand to form a positive grip. This quality of a handrail was known, or should have been known by those constructing the ramp in 1978. The current Connecticut Building Code prohibits a perimeter dimension of handrail exceeding 6 ¼ inches to provide a

---

[3] Guidelines for Stair Safety, a 1979 nationally published study by the National Bureau of Standards and the CPSC identified that one riser steps are inconspicuous and dangerous (Section 2.5.6).

graspable bar, addressing the same quality of a graspable handrail as the BOCA 1970 requirement for pipe rails in effect at the time of the original construction.

The wood board along the subject ramp has a total perimeter of 13 ½ inches, more than twice the maximum permitted by the current State Building Code, and cannot be effectively grasped by an average hand. Furthermore, the board stopped short and failed to provide any extension where the unexpected drop-off at the end of the ramp would add to the need for a handrail to control descent where Orcutt tripped at the bottom of the ramp. The board's poorly maintained condition further discouraged use due to the rough and splintered condition of the wood and was not reasonably maintained for safe use as a handrail, if that was intended.

The absence of a functional reasonably maintained handrail denied Orcutt a grab bar to assist in her descent down the excessively steep ramp, and denied her a grab bar that might have aided recovery from her loss of balance as she stepped at the end of the ramp.

## G. FINDINGS

Within the bounds of reasonable technical certainty, and subject to change if additional information becomes available, it is my professional opinion that:

1. The conditions of the ramp where Jodi Orcutt fell were hazardous and a substantial cause of her fall and resulting injury.

2. The characteristics of the ramp and landing that caused the fall did not comply with the Connecticut State Building Code and other widely accepted building safety standards with regards to excessive steepness, absence of effective handrail, and the irregular landing with unexpected drop-off at the bottom of the ramp.

3. Those responsible to maintain the building should have known of the unsafe conditions and repaired the unsafe elements to provide a safe means of egress from the building that conformed with reasonable standards.

4. It was foreseeable that the conditions of this ramp would increase the likelihood of a fall and injury by members of the public.

David C. Cowen, A.I.A.

# EXHIBIT  3

**Affidavit of Stephen P. Bertucio dated
January 21, 2009**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JODI ORCUTT, ET AL : CASE NO: 3:07 1306 VLB

V. :

SPICERS NOANK INNER MARINA LLC : JANUARY 21, 2009

### AFFIDAVIT OF STEPHEN P. BERTUCIO

     I, Stephen P. Bertucio, being sworn hereby deposes and says:

     1)    I am an attorney and represent the plaintiff in the action entitled <u>Jodi Orcutt v. Spicers Noank Inner Marina, LLC.</u>

     2)    During the discovery phase of this case I received defendant's compliance to the plaintiff's interrogatories, on or about June 18, 2008. Under date of July 8, 2008, I forwarded a copy of the defendant's discovery compliance to David C. Cowen, A.I.A., the plaintiff's liability expert.

     3)    Subsequently I noticed the deposition for a representative of the defendant entity. The deposition was ultimately done on October 17, 2008. Per office computer notes the deposition transcript of the defendant's representative was received by my office on November 6, 2008.

     4)    On October 30, 2008, I received notice from the court that the <u>Orcutt</u> case was referred to Magistrate Judge Thomas P. Smith for a settlement conference. I also received notice from the Court regarding dates for submitting the Joint Trial Memorandum and attendance at a pretrial conference and jury selection.

     5)    Based on the facts of this case, Mr. Cowen's opinions and having learned that the building and ramp were constructed in 1977 or 1978, I was aware that I would need to have Mr. Cowen review the defendant's discovery responses and the representative's deposition transcript and then have Mr. Cowen update or clarify his position.

     6)    I was optimistic that this case would settle at the settlement conference. However, at that point in time, this office had incurred significant litigation expenses, particularly in connection with the expenses associated with the expert witness. In light of the possibility of resolving this case at the settlement conference I had concerns that incurring additional expenses through having Mr. Cowen review the deposition transcript would increase this firm's litigation expenses which would likely affect or impair the

plaintiff's ability to resolve this matter at the settlement conference. Accordingly, I decided to refrain from forwarding the deposition transcript to Mr. Cowen pending attendance at the settlement conference.

7)     On January 5, 2009, the parties attended a settlement conference with Magistrate Judge Smith. However this case was not resolved. On January 7, 2009, I forwarded the deposition transcript to Mr. Cowen with instructions to review same and advise of any changes in his position. On January 12, 2009, I received Mr. Cowen's amended/revised report and forwarded same to defendant's defense counsel on January 13, 2009.

Signed this 21st day of January, 2009.

Stephen P. Bertucio

STATE OF CONNECTICUT}    SS.

COUNTY OF HARTFORD }       January 21, 2009

Personally appeared, Stephen P. Bertucio, signer of the foregoing Instrument and acknowledged the same to be his free act and deed before me.

Notary Public

NATASHA WOLAK
NOTARY PUBLIC
STATE OF CONNECTICUT
My Commission Expires April 30, 2011